Argued January 7, affirmed June 12, petition for rehearing
denied July 15, 1975

## STATE FARM FIRE AND CASUALTY COMPANY, *Appellant, v.* SEVIER ET AL, *Respondents.*

537 P2d 88

*Robert H. Grant* of Grant & Ferguson, Medford, argued the cause and filed the briefs for appellant.

*James L. Sutherland,* Medford, argued the cause for respondents Sutton and Mutual of Enumclaw Insurance Co. With him on the brief were Frohnmayer & Deatherage, Medford.

TONGUE, J.

This is an action by an insurance company for a declaratory judgment that it had "validly rescinded" a policy of automobile liability insurance because of misrepresentations by the insured in his application for the policy. The named defendants included not only the insured, but also the personal representative of a

person killed in a subsequent accident with the insured before the policy was rescinded.[1] The case was tried before the court, without a jury. Plaintiff appeals from an adverse judgment. We affirm.

The principal misrepresentations alleged were that the insured gave false answers to questions on the application asking whether, during the past five years, he had been convicted for a traffic violation or had his driver's license suspended, revoked or refused.

*The facts.*

1. *The policy issued in Arkansas.*

From 1961 to 1970 Kenneth Sevier had been at the Veterans Administration "Domiciliary" hospital at White City, near Medford, except for several months in California and occasional furloughs to his original home in Arkansas. During that entire period he had no Oregon driver's license, but he did have a California driver's license. In 1969 he was arrested and convicted in Oregon for driving under the influence of intoxicating liquor. A notice was then mailed to him by the Oregon Department of Motor Vehicles that his right to apply for an Oregon driver's license had been suspended. Sevier did not recall receiving that notice.

In December 1969 he returned to his "home town" in Arkansas. On May 29, 1970, having purchased an automobile, he went to see Jack Henderson, one of plaintiff's insurance agents. Henderson filled out an application for a policy of automobile insurance which included a question asking whether, during the past five years, the applicant had been convicted for traf-

---

[1] The defendants included Kenneth Sevier, the insured; Elva Sutton, both as the personal representative of the estate of Marion Leroy Sutton, deceased, and as an individual injured in the same accident; and also Mutual of Enumclaw Insurance Company, which had paid certain amounts to the Suttons for injuries caused by an uninsured motorist and for which it sought reimbursement from plaintiff.

fic violations and a question asking whether his license to drive was ever suspended, revoked or refused.

Sevier testified that Henderson did not ask him those two questions. He also testified that he had known Henderson "for a long time" and that he told Henderson that he had been picked up and convicted for drunken driving in Oregon. He also testified that Henderson said "to Hell with it, maybe they'll never find it out"; that he did not know that Henderson put a "no" answer in the "box" for that question, and that he signed the application as filled out by Henderson.

Henderson testified that he asked both questions. He also admitted that Sevier told him that he had been stopped by the police for drinking and driving and given a "balloon" or "breathalyzer" test, but said that he had not been convicted for DUIL. Henderson denied, however, that when Sevier told him about that incident he said "to Hell with it, maybe they'll never find it out," as testified by Sevier.

That application for insurance was then sent to plaintiff's office in Monroe, Louisiana, for consideration by its underwriting department. The application showed "no" answers to both questions and made no reference to the 1969 DUIL arrest and conviction in Oregon.

Plaintiff's underwriting department then had a "routine, general" investigation of Sevier made by the Retail Credit Company. That investigation included contacts at White City, apparently because his application indicated "physical or mental defects" or limitations and because of further information from Henderson that Sevier had been at the Veterans "Domiciliary" in White City for nine years. No request was made, however, for a "motor vehicle record check," as

would have been done by Retail Credit as a part of its investigation upon request at a cost of $1.40.

Plaintiff's witness testified that if plaintiff had been informed by its agent Henderson that Sevier had been stopped for drinking and driving and had been required to take a test (as admitted by Henderson), "there is a good chance" that a motor vehicle check would have been requested. The same witness testified that if plaintiff had been informed by Henderson that Sevier had been convicted of DUIL it would not have issued the policy to Sevier. Other witnesses for plaintiff testified that the reason for an investigation is to "double check" the applicant's answers because plaintiff does not always rely upon such answers.

In any event, after a delay of 40 days, plaintiff issued a policy of automobile liability insurance to Sevier in Arkansas for a period of six months, effective July 7, 1970. Meanwhile, Sevier had applied through Henderson for other insurance under an "assigned risk pool," which would have been available to him at a higher premium, but that application was withdrawn when plaintiff issued its policy to him.

2. *Re-issue of policy in Oregon.*

In September 1970 Sevier returned to White City. He was told by Henderson to re-apply for a policy in Oregon. According to plaintiff's witnesses, when a policyholder moves from another state to Oregon, a new application is then filled out and submitted to plaintiff's underwriting department, which then also has and reviews a file from the other state including the original application. The decision whether to re-issue a policy is then based upon both applications and upon a comparison of the information in both, as well as upon other information in the file from the other state, but without making "the same type of investigation" of the insured as made on the original applica-

tion. Also, once a policy is issued it is "renewed automatically" upon billing the insured for the premium, and without further investigation, unless an accident or "something like that" has been called to plaintiff's attention.

In November 1970, Sevier went to the office of one of plaintiff's agents in Medford, who filled out a new application. That agent considered his Arkansas policy to be "a policy that was in force" and that "all I was doing was taking a transfer * * * on the policy that was already in force."

Sevier testified that he did not remember whether the woman who filled out the application asked him whether he had been convicted of any traffic violation or whether his driver's license had been revoked, suspended or refused. The trial court found, however, that he was asked those questions and answered them "no." At that time he said nothing of his prior arrest or conviction for DUIL or of the suspension of his right to apply for an Oregon driver's license.

That application was then signed by Sevier and sent to plaintiff's Oregon underwriting department and a new policy was issued for an additional six months, effective January 7, 1971. According to plaintiff's witnesses, that policy was issued based on the new application and on the information in the "Arkansas file" with no additional investigation. Plaintiff's witnesses also testified, however, that if Henderson, the original agent, had made a notation on the file that Sevier had been stopped in Oregon for drinking they would have made a further investigation and that if it had appeared that Sevier had been convicted of DUIL the new policy would not have been issued and the original policy would have been rescinded. A witness for plaintiff also testified that if the application had been made as one for a new policy in Oregon a

"motor vehicle check" would have been made; that a motor vehicle check is made in Oregon on 85 to 90 per cent of all new business and that the cost of such a check was $1 for an "uncertified" copy and $2.50 for a certified copy.

Defendants offered the testimony of a witness with experience in underwriting to the effect that the underwriting practice of at least some other insurance companies doing business in Oregon would be, upon receiving a file from Arkansas in connection with a "re-application" for insurance under the circumstances of this case, to request an Oregon motor vehicle check and that this would have been done if it had appeared in the file from Arkansas that 'the insured had been stopped by the police in Oregon for drinking and driving and had been given a test.

3.  *Accident: termination and rescission of policy.*

On March 15, 1971, Sevier was involved in the accident in which Mr. Sutton was killed and his wife injured. Within approximately two weeks after the accident, plaintiff's Oregon underwriting department superintendent learned from its claims department that there was a "total loss," with "drinking involved," and of the previous DUIL conviction. Sevier signed a statement on May 3, 1971, admitting that DUIL conviction. On May 7, 1971, plaintiff called the Oregon Department of Motor Vehicles by telephone to confirm that conviction.

On May 17, 1971, plaintiff mailed to Sevier a "Notice of Intent Not to Renew" the policy on July 7, 1971, the date when the policy normally would have been "automatically renewed." In that notice the "box" was "checked" for "Notice of Intent Not to Renew" and the "box" for "Notice of Cancellation" was not "checked." The underwriter responsible for that notice was aware of the difference between termination and

rescission of an insurance policy. The "rescission question" was then referred to an attorney.

On July 7, 1971, more than three months after learning in late March from its claims department of Sevier's DUIL conviction in 1969 and more than one year after its agent Henderson was informed of that fact by Sevier, plaintiff sent a letter to Sevier enclosing a check for the amount of all premiums. paid by him in both Arkansas and Oregon and rescinding the policy. The tender of that check was refused by Sevier.

On August 12, 1971, plaintiff paid to Ford Motor Credit Corporation the sum of $1,680.68 in payment for the "total loss" of Sevier's automobile, in accordance with a "loss payable to lienholder" clause of the policy and apparently without giving Ford a 10-day notice of cancellation or termination, as provided by that clause.

On August 10, 1971, plaintiff filed a complaint in this action, alleging that the policy was issued in reliance upon misrepresentations by Sevier and seeking a declaratory judgment that it had "validly rescinded" the policy and that plaintiff had no liability under it for the death of Mr. Sutton or the injury to his wife. Subsequently, plaintiff filed an amended complaint to the same effect. Defendants' answer to that complaint alleges, as an affirmative defense, that "plaintiff was negligent in failing to investigate the insured and therefore is estopped to rescind the policy because of alleged misrepresentations."

*The findings and decision by the trial court and contentions of appellant.*

The trial court found that at the time of his original application the insured told plaintiff's agent in Arkansas that "he had lived in Oregon the previous nine years"; that "he had been charged for driving and drinking and had taken some type of test"; and that he

had a "drinking conviction." The court found further that the plaintiff was negligent in that its agent "failed to note the information given to him by * * * Sevier on the * * * application concerning * * * Sevier's being stopped for a drinking and driving charge"; in that it failed "to request a motor vehicle check in Oregon at the time of the Arkansas application, which * * * would have disclosed that * * * Sevier had been convicted" of DUIL; and in that it renewed "the policy in Oregon, relying upon its Arkansas application where there had been no motor vehicle check."

Based upon these findings the trial court concluded that "plaintiff had a duty to the public to make a reasonable investigation of the insurability of * * * Sevier within a reasonable time after the issuance of the policy," and that its failure "to make such reasonable investigation" prohibits it "from rescinding the Sevier policy as to the claims of" the other defendants. As authority for that holding the trial court cited the decision by the California Supreme Court in *Barrera v. State Farm Mutual Automobile Ins. Co.,* 71 Cal 2d 659, 79 Cal Rptr 106, 456 P2d 674 (1969). In *Barrera* it was held, under somewhat similar facts, that an automobile insurance company has a duty to the public to make a reasonable investigation within a reasonable time after the issuance of a policy and that it cannot thereafter rescind a policy so as to deny its coverage to the claim of an injured person.

Plaintiff's primary contention on this appeal is that in Oregon the rights of an injured person are no greater than the rights of the insured, with the result that the failure of an insurance company to make a motor vehicle check or other investigation of the insured does not take away its right to rescind a policy for false representations by an insured "as to the claims" of an injured person, despite the holding to

the contrary by the California court in *Barrera v. State Farm Mutual Automobile Ins. Co., supra.*

Plaintiff also contends, in response to a request by this court for supplemental briefs, that the decision of the trial court in this case cannot properly be affirmed by application of the usual rule of contract law that a party to a contract who has knowledge of facts constituting grounds for rescission must do so promptly or lose the right to rescind. The reason why that rule does not apply in this case, according to the plaintiff, is that the knowledge of its agent that Sevier had been convicted of DUIL was not imputed to it by reason of collusion between Sevier and his agent, in that Sevier knew that the answers contained in the application for the policy were false and participated in the fraud.

*An insurance company cannot rescind a policy of automobile insurance when it had knowledge of facts which constituted grounds for rescission and failed to rescind promptly.*

█ The general rules of contract and agency law are well established to the effect that notice to an agent is notice to his principal;[2] that a party who has notice of grounds for the rescission of a contract and who elects to rescind it must do so promptly or lose his right to rescind;[3] that when a contract has been induced by misrepresentation by one party, so that the other party has an election whether to affirm the contract or to rescind it and return any payments received, one who retains the payments received and acts in a manner inconsistent with an intent to rescind the con-

---

[2] Restatement of Agency 2d § 9(3) and § 272. In this case the trial court found that on May 29, 1970, Sevier notified plaintiff's agent Henderson of his DUIL conviction prior to the issuance of the policy in Arkansas.

[3] Engelking v. Field, 268 Or 537, 542, 522 P2d 493 (1974). In this case plaintiff did not attempt to rescind the policy until July 7, 1971.

tract cannot later seek to rescind the contract;[4] and that one who rescinds a contract must ordinarily rescind the entire contract and cannot, at the same time, recognize the continued existence and enforceability of a portion of the contract.[5]

Consistent with these established rules, it has been held by other courts that an insurance company which has knowledge through one of its agents of the falsity of facts stated in an application for insurance and which nevertheless issues an insurance policy is either "estopped" from rescinding the policy based upon the alleged misrepresentation of such facts or cannot then establish that it acted in reliance upon such misrepresentations, as necessary for the rescission of a contract for misrepresentation.[6]

Although in such a case there may not be an

[4] See Briscoe v. Pittman, 268 Or 604, 607, 522 P2d 886 (1974), and Anderson v. Laws et al, 176 Or 468, 472-73, 159 P2d 201 (1945). In this case plaintiff at first retained the premiums received by it and gave notice that its policy would terminate as of July 7, 1971, the date on which it would expire unless renewed.

[5] See Pickinpaugh v. Morton, 268 Or 9, 17, 519 P2d 91 (1974), citing 12 Williston on Contracts § 1464 (3d ed 1970). In this case plaintiff paid Ford for damages to insured's automobile under an endorsement which became a part of the policy and for which there was no apparent separate consideration.

[6] See Union Insurance Exchange, Incorporated v. Gaul, 393 F2d 151, 166 (7th Cir 1968). Cf. State Farm Mut. Auto. Ins. Co. v. Wall, 92 NJ Super 92, 222 A2d 282, 286 (1966), and MFA Mutual Insurance Company v. Meisinger, 183 Neb 285, 159 NW2d 829, 831 (1968).

Cf. Bunn v. Monarch Life Insurance, 257 Or 409, 416-17, 478 P2d 363 (1971), overruling Comer v. World Insurance Co., 212 Or 105, 318 P2d 916 (1957), in which we said, although in a different context, that:

"* * * The false answer is made by the insurer's agent and on the basis of the well-established principle of agency, the insurer should be bound by the acts of its agent. * * *"

We also said in Farnsworth v. Feller, 256 Or 56, 62, 471 P2d 792 (1970), again in a different context, that negligence may be a defense in a suit for rescission.

estoppel in the sense in which that term is ordinarily used, we agree with the results of the holdings of these cases by application of the usual rule in contract cases to the effect that one who has knowledge of facts constituting grounds for the rescission of a contract may have an election of remedies; that if he elects to rescind the contract he must do so promptly; and that if he fails to do so he cannot subsequently rescind the contract.

In this case plaintiff, through its agent Henderson, acquired knowledge of the fact that Sevier had at least been stopped by the police for drinking and driving and had been given a "balloon" or "breathalyzer" test. Indeed, the trial court found that plaintiff's agent had knowledge of the fact that Sevier had been convicted for DUIL. As a corporation, plaintiff could act only through its agents and employees and once it acquired knowledge of that fact through one of its agents or employees plaintiff was chargeable with continued knowledge of that fact, regardless of whether or not its agent Henderson failed to make a written record of that fact or to convey that information to other agents or employees of the plaintiff.

It was conceded by plaintiff's underwriters that if they had been informed of that fact they would have either refused to issue the original policy or would have made an investigation of the records of the Oregon Department of Motor Vehicles to confirm that fact.

It was also conceded by plaintiff's underwriters that when Sevier, in accordance with instructions by Henderson, applied for a renewal of the policy after returning to Oregon, they did not rely solely upon the answers given by him to plaintiff's Medford agent in the written application for renewal of the policy but that they also relied upon the information included in plaintiff's file from Arkansas. That plaintiff did not rely solely upon such answers by Sevier in Oregon is

further demonstrated by the testimony of plaintiff's underwriters that even if this had been an application for a new policy in Oregon, a "motor vehicle check" would have been made for previous Oregon traffic violations and that the reason that no such check was made in this case was that this was not an application for a new policy, but for the renewal of the Arkansas policy, and that in deciding whether to issue the new Oregon policy they relied not only upon Sevier's new application, but also upon plaintiff's file from Arkansas. To the same effect, they also testified that if Henderson had made a notation in that file of that fact either a motor vehicle check would have been made or the policy would not have been renewed.

It follows from this testimony, in our opinion, that at the time that both the Arkansas policy and the Oregon "renewal" policy were issued plaintiff had knowledge of facts which constituted sufficient grounds for the rescission of both policies. It also follows, in our opinion, that if plaintiff desired to elect to rescind the Oregon policy it was required to do so promptly, and that in this case plaintiff did not undertake to rescind promptly, but did not do so until July 7, 1971, the date on which the Oregon policy expired by its terms. We hold that it was then too late to do so.

Because we decide this case upon these grounds we need not consider and decide the questions whether plaintiff, as an automobile liability insurance company, had a duty to the public, under the facts and circumstances of this case, to make a reasonable investigation of Sevier before it issued to him a policy of automobile liability insurance and whether the plaintiff was negligent, under the facts and circumstances of this case, in that it failed to make such an investigation.

For the same reasons, we need not decide whether to adopt the rule adopted by the California Supreme

Court in *Barrera v. State Farm Mutual Automobile Ins. Co.,* 71 Cal 2d 659, 79 Cal Rptr 106, 456 P2d 674 (1969), as apparently adopted by the trial court as the basis for its decision and as strongly urged by the defendants on this appeal.⑦

In this case the trial court found that plaintiff insurance company, through its agent Henderson, had been told by Sevier that he had been both arrested and convicted in Oregon for driving while intoxicated; that a check of the Oregon motor vehicle records would have disclosed that in 1969 he had in fact been convicted for such a violation; and that under these facts plaintiff had a duty to investigate the in-

---

⑦ In Barrera v. State Farm Mutual Automobile Ins. Co., 71 Cal 2d 659, 79 Cal Rptr 106, 456 P2d 674, 677 (1969), in which the misrepresentation by the insured of his past driving record was not discovered by the insurer until *after* a subsequent accident, it was held that even in the absence of the knowledge of facts at the time of the issuance of the policy that would cause a reasonable insurer to make an investigation an automobile liability insurer has a duty to "undertake a reasonable investigation of the insured's insurability within a reasonable period of time from the acceptance of the application and the issuance of a policy"; that this duty "directly inures to the benefit of third persons injured by the insured," who may "properly proceed against the insurer" to compel payment of an unsatisfied judgment against the insured, and that "the insurer cannot then successfully defend upon the ground of its own failure reasonably to investigate the application."

To the same effect, see State Farm Mutual Automobile Ins. Co. v. Wood, 25 Utah 2d 427, 483 P2d 892, 893 (1971). Cf. Bernstein v. Nationwide Mutual Insurance Company, 458 F2d 506 (4th Cir 1972); Fireman's Fund Insurance Company v. Knutsen, 132 Vt 383, 324 A2d 223, 229 (1974); Government Employees Insurance Company v. Chavis, 254 SC 507, 176 SE2d 131, 137 (1970); Mayflower Insurance Exchange v. Gilmont, 280 F2d 13, 16 (9th Cir 1960); and Allstate Ins. Co. v. Sullam, 76 Misc 2d 87, 349 NYS2d 550, 558 (1973).

See also Couch on Insurance 2d 11-12, § 35:41 (1974 Supp); Comment: Reasonable Investigations and the Financial Responsibility Law—Protecting the Innocent Third Party, 3 Loyola U L Rev 169 (1970); Note, 47 Tulane L Rev 199 (1972). Cf. Bailey v. Universal Underwriters Ins., 258 Or 201, 223, 474 P2d 746, 482 P2d 158 (1971).

surability of Sevier and was negligent in failing to request such a motor vehicle check within a reasonable time after the issuance of the policy.

Although we do not necessarily agree with that course of reasoning by the trial court, for reasons previously stated, we agree with its holding that under these facts plaintiff insurance company may not wait for more than one year and until after the accident in which Mr. Sutton was killed and Mrs. Sutton was injured before making any attempt to rescind the policy so as to deny liability to them.

*The knowledge of plaintiff's agent that Sevier had been convicted of DUIL was imputed to plaintiff for the purposes of this case.*

Plaintiff vigorously contends that the knowledge of its agent of Sevier's DUIL conviction was not imputed to it because of alleged collusion between its agent and Sevier to withhold knowledge of that fact from it.

Plaintiff's claim of collusion is based upon testimony that Sevier was given an opportunity to read the application before signing it and knew that the answers in the application as filled in by plaintiff's agent were false and upon the further testimony that, according to Sevier, when he told plaintiff's agent of his DUIL conviction the agent said "to Hell with it, maybe they'll never find it out."

The evidence was conflicting on both of these points. Plaintiff's agent denied that he said "to Hell with it, maybe they'll never find it out." He also testified that he was not sure whether or not Sevier read the application before signing it. At the time of his deposition Sevier said that he knew that the agent wrote down false answers in the application before he signed it, but on trial he testified that he did not know

what answers the agent wrote down. No findings were made by the trial court on these issues.

■■ Because we review this case de novo, as in a suit in equity to rescind a contract, the failure of the trial court to make such findings is not fatal. It may also be doubtful whether such evidence was sufficient to support a finding of collusion.[8] Regardless of such facts, however, we hold that for the purposes of this case the knowledge of plaintiff's agent that Sevier had been convicted of DUIL was imputed to the plaintiff.

There may be good reasons why, in litigation between an insurance company and an insured who has acted in collusion with an agent of the company in concealing facts from it, there should be an exception to the general rule that knowledge to the agent of the company is to be imputed to it. The reason for that result in such cases is not so much that the knowledge of the agent was not imputed to the principal, but that a participant in a fraud should not be permitted to profit from his own fraud. Such reasons, however, have no proper application in litigation between an automobile insurance company and an innocent person who was injured by the negligence of the insured. The cases cited by plaintiff, all from other jurisdictions, either involve litigation between the insurer and insured or do not discuss the question whether a different rule should apply in cases involving innocent third parties.[9]

The rule that knowledge of an agent is to be imputed to his principal, regardless of actual knowl-

[8] Cf. Bunn v. Monarch Life Insurance, *supra,* note 6, and Lindstrom v. National Life Insurance Company, 84 Or 588, 592-94, 165 P 675 (1917). See also 3 Merrill on Notice 327, § 1337 (1952), and Restatement of Agency 2d §§ 268, 271.

[9] Southern Farm Bureau Ins. Co. v. Allen, 388 F2d 126, 131-32 (5th Cir 1967), is the only case cited by plaintiff involving a claim by a third party injured in an automobile accident and does not consider or discuss this question.

edge by the principal, is a rule based upon considerations of public policy to the effect that one who selects an agent and delegates authority to him should incur the risks of the agent's infidelity or want of diligence rather than innocent third persons. See 3 Merrill on Notice §§ 1204, 1268, at 132-34, 252 (1952). Cf. Restatement of Agency 2d § 282(2)(a). Those reasons of public policy are not present in cases involving litigation between a principal and a third party who has acted in collusion with the agent. When, however, as in this case, the injured party is one who did not act in collusion with the agent, those same reasons of public policy are present.

This public policy in automobile insurance cases is also consistent with the terms of ORS 744.165 which provides:

> "*Insurance agent is agent of insurer.* Any person who solicits or procures an application for insurance shall in all matters relating to such application for insurance and the policy issued in consequence thereof be regarded as the agent of the insurer issuing the policy and not the agent of the insured. Any provisions in the application and policy to the contrary are invalid and of no effect whatever."[10]

A rule in automobile insurance cases under which knowledge of an agent is imputed to his principal in cases involving third persons injured in automobile accidents, despite possible collusion between the insured and the insurance agent, would not encourage fraud, as suggested by the plaintiff. On the contrary, it provides no inducement for the insured to enter

---

[10] According to Merrill, *supra,* note 8, 205, § 1240:

"* * * The decisions which interpret [such statutes] as imposing upon the company notice with respect to all pertinent knowledge possessed by the solicitor or negotiator during the bargaining for the policy * * * are the sounder."

See also Merrill, *supra,* 264, § 1290.

into a fraudulent scheme with the agent of the insurance company for the reason that if collusion is proven the insurer, after satisfying the injured person's claim, may prosecute a cause of action against the insured for fraud or, in an action brought by the insured, defend on the ground of collusion. Instead, this rule should encourage the insurer to select and to supervise its agents with greater care.

Such a rule is also consistent with the strong reasons of public policy embodied in the Oregon Financial Responsibility Law, ORS ch 486, although that law has no direct application to the facts of this case. Even in cases not subject to the provision of that law we said in *State Farm Ins. v. Farmers Ins. Exch.,* 238 Or 285, 292-93, 387 P2d 825, 393 P2d 768 (1964), that:

"This court and the Oregon Legislature have recognized this interest of an injured party. In *In re Vilas' Estate,* 166 Or 115, 135, 110 P2d 940 (1941), this court stated:

" 'The public policy of this state is to protect as far as possible those injured through the carelessness or negligence of motor vehicle operators who make use of its highways. * * *'

"* * * * *

"These legislative declarations reflect a governmental policy in favor of protecting the innocent victims of vehicular accidents even though the tortfeasor may have been totally indifferent to the rights of others."

To the same effect, see *Bailey v. Universal Underwriters Ins.,* 258 Or 201, 474 P2d 746, 482 P2d 158 (1971).

For these reasons we hold that when Sevier told plaintiff's agent of his DUIL conviction, knowledge of that fact was imputed to the plaintiff insurance company for the purposes of this case.

*Plaintiff's other contentions.*

As previously stated, plaintiff also contends that in Oregon the right of an injured third person under a policy of automobile liability insurance can be no greater than those of the insured, citing *Bonney v. Jones,* 249 Or 578, 580, 439 P2d 881 (1968); *Oregon Farm Bureau v. Safeco,* 249 Or 449, 453, 438 P2d 1018 (1968); and *Allegretto v. Oregon Auto. Ins. Co.,* 140 Or 538, 544, 13 P2d 647 (1932). Those cases involved the failure of insureds to give prompt notice to insurance companies after accidents so as to permit the insurers, as quickly as possible, to investigate the accidents and discover all relevant facts and so as to prevent prejudice to insurance companies resulting from delays in undertaking such investigations. None of those cases involved the rescission of such an insurance policy for misrepresentation in an application for insurance or the failure of such an insurance company to rescind promptly after receiving knowledge of facts constituting grounds for rescission—a problem involving quite different considerations, for reasons previously stated.

■ Plaintiff also assigns as error the overruling of its demurrer to defendants' affirmative defense alleging that "plaintiff was negligent in failing to investigate the insured and therefore is estopped to rescind the policy because of alleged misrepresentations * * *." Plaintiff contends that this defense "was not proper pleading of estoppel because it lacked many of the elements of estoppel." We might agree that defendants' pleading was not sufficient as a pleading of estoppel, as such. It was a sufficient pleading in this case, however, because it alleged, among other facts, that on May 29, 1970, Sevier informed plaintiff's agent Henderson that he had been convicted of DUIL; that a period of nine and one-half months elapsed between that date and the date of the accident

on March 15, 1971; and that the policy was still in effect (and had not been rescinded) as of that date—facts which we have held sufficient to constitute a defense in this case.

Plaintiff says that "the sole issue in this case is whether or not the judgment can be sustained upon the basis of the law as expressed by the California court in *Barrera* * * *." We believe, however, that the basis for our decision in this case is not only within the scope of the pleadings, for reasons just stated, but that it is within the theory on which this case was tried and argued on appeal. It is true that the emphasis of defendants' contentions has been upon the theory of *Barrera*. Nevertheless, defendants also pleaded and contended in their brief on appeal that plaintiff had "waived" its right to rescind and was not entitled to wait until July 7, 1971, to rescind its policy, particularly after first sending notice that the policy would be terminated on July 7, 1971, the expiration date (subject to renewal). In support of that contention, defendants cited cases in support of the proposition that "*any delay* in rescinding a contract is evidence of ones intent to ratify the same."

██ We are reluctant to reverse a trial court on grounds or theories other than those on which a case is tried and decided unless the parties have been afforded an opportunity to submit further briefs or argument. The considerations are different in cases in which we affirm a trial court. In such cases, when the trial court arrived at a correct result, but on grounds different than those which, in our opinion, are more proper as the basis for such a result, we believe that it is not improper to affirm the trial court; provided, of course, that the pleadings are sufficiently broad and there is sufficient evidence in the record, as in this case.

██ We believe that this is particularly proper in

suits in equity, which we try de novo on appeal. Although this is an action for declaratory judgment, the question presented for decision is whether plaintiff had the right to rescind its policy. Thus, in essence, the question presented for decision is the same as in a suit for rescission of a contract, which is a suit in equity. As we have previously held, whether an action for declaratory judgment is to be treated as an action at law or as a suit in equity normally depends upon the essential nature of the case, including the nature of the relief sought.[10]

Moreover, in this case both parties were afforded an opportunity to submit supplemental briefs and reply briefs upon the questions whether plaintiff was bound from rescinding the policy because of delay in doing so promptly after receiving knowledge of facts providing grounds for rescission, including the question whether knowledge of such facts by its agent was imputable to the plaintiff.

■ Plaintiff also assigns as error the failure of the trial court to make findings of fact upon the materiality of the misrepresentations and reliance by plaintiff upon them, as requested by it at the time of trial. Plaintiff concedes, however, that if such findings are necessary such findings may be made by this court in reviewing this case de novo.[11] The same is true of

[10] See Lilenquist v. Pitchford's Inc., 269 Or 339, 525 P2d 93 (1974), and cases cited therein. See also Mayer v. First Nat. Bank of Oregon, 260 Or 119, 133, 489 P2d 385 (1971). Cf. Lee v. State Farm Mut. Auto. Ins. Co., 265 Or 1, 2, 507 P2d 6 (1973), and General Acc. Fire & Life Assur. Corp., Ltd. v. Shasky, 266 Or 312, 314, 512 P2d 987 (1973).

[11] Plaintiff also concedes that such findings would be superfluous in the event that the decision of this case is based upon Barrera v. State Farm, supra. Although we do not adopt Barrera, for reasons previously stated, we believe that the basis of this decision is also such that the requested findings were not necessary and that the record is sufficient to support the decision in this case.

plaintiff's request for findings that misrepresentations were made by Sevier in his applications for insurance.

Finally, plaintiff assigns as error the admission of testimony by a witness offered by defendants and who testified concerning the underwriting practices of some other insurance companies in Oregon. We believe that the qualifications of that witness were such that the trial court did not abuse its discretion in permitting him to testify. See *Wulff v. Sprouse-Reitz Co., Inc.,* 262 Or 293, 305, 498 P2d 766 (1972).[9] Moreover, this was not a jury trial and there was ample other evidence to support the judgment in favor of the defendants in this case. Cf. *Thomas v. Howser,* 262 Or 351, 357, 497 P2d 1163 (1972).

For all of the reasons stated above, and finding no error, we affirm the judgment of the trial court.

O'CONNELL, C. J., dissenting.

The majority holds that an injured third party may recover on a policy of insurance even though the insured would not be allowed to enforce the policy. In so doing, it introduces much confusion into the law of agency and, although purporting to avoid the question, effectively adopts the reasoning and effect of *Barrera v. State Farm Mutual Automobile Insurance Co.,* 71 Cal2d 659, 79 Cal Rptr 106, 456 P2d 674 (1969), which rejects the fundamental principles of the law of contract. The opinion of the majority is not supported either by logic or any of our prior cases on the subject. I dissent.

---

[9] In addition, even though that witness may not have had knowledge of the practices of all insurance companies doing business in Oregon, his testimony relating to the practices of some of such insurers was nevertheless admissible for consideration on the question whether plaintiff acted reasonably even though not sufficient to establish the custom or practice in an industry. See Celorie v. Roberts Bros., Inc., 202 Or 671, 685-86, 276 P2d 416 (1954), and Silver Falls Co. v. E. & W. Lbr Co., 149 Or 126, 177, 40 P2d 703 (1935).

The fundamental fallacy of the majority's position is found in the following passage:

> "The rule that knowledge of an agent is to be imputed to his principal, regardless of actual knowledge by the principal, is a rule based upon considerations of public policy to the effect that one who selects an agent and delegates authority to him should incur the risks of the agent's infidelity or want of diligence rather than innocent third persons. See 3 Merrill on Notice §§ 1204, 1268 at 132-34, 252 (1952). Cf. Restatement (Second) of Agency § 282(2)(a). Those reasons of public policy are not present in cases involving litigation between a principal and a third party who has acted in collusion with the agent. When, however, as in this case, the injured party is one who did not act in collusion with the agent, those same reasons of public policy are present."

The point the majority fails to note is that the rights of one injured through the negligence of the insured are derivative of the rights of the insured.[1] The third party, however innocent, has no right to recover from the insurer unless there is a duty to pay the losses of the insured growing out of a valid contract of insurance or a duty to the public "at large." Since the majority does not deem it necessary to follow *Barrera* in recognizing such a duty to the public, it must explain how the third party may recover on a contract of insurance to which it is not a party or an intended beneficiary and which is rendered voidable as to the insured through his misrepresentations of a material fact. This the majority does not do.

It is clear that plaintiff is entitled to rescind

---

[1] Specific statutes such as ORS 743.783, which requires the inclusion of a clause requiring the insurer to pay a final judgment of its insured up to the limits of the policy notwithstanding the insolvency or bankruptcy of the insured, create specific exceptions to the indemnity nature of the contract, but do not purport to change entirely the basic nature of the contract.

the contract as to Sevier, its insured. There can be no question that had Sevier merely answered "no" in response to the question of whether he had been convicted of a traffic violation within the prior five years, plaintiff would be entitled to rescind the contract of insurance as to him. These answers entered on the application were misrepresentations without which plaintiff would not have issued Sevier a policy.[2] Plaintiff relied upon these misrepresentations.[3] Sevier, however, disclosed to plaintiff's agent Henderson sufficient facts to put plaintiff on notice of the falsity of the representations in the application.[4] Defendants contend that Henderson's knowledge, which was admittedly not transmitted to plaintiff's underwriters, should be imputed to plaintiff. The general rule of imputation of knowledge or notice is well settled:

> "* * * 'The corporation is affected or charged with knowledge of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of his employment and within the scope of his authority, even though the officer or agent does not in fact communicate his knowledge to the corporation through its other officers or agents. * * *.'" *Woodtek, Inc. v. Musulin,* 263 Or 644, 650, 503 P2d 677 (1972).[5]

This general rule is subject to an exception, however, which is applicable to the facts of this case. The knowledge of notice of the agent is not imputed to the principal when the person knows the agent is

[2] ORS 743.042 (1) (b).

[3] *Cf.,* Mayflower Insurance Exchange v. Gilmont, 280 F2d 13, 17 (9th Cir 1960).

[4] Plaintiff admitted as much through the testimony of its Arkansas underwriter that had they known that Sevier had been subjected to a breath test the investigation would have been extended, probably to the point of ordering a Motor Vehicles Department report.

[5] See also, Fleishhacker v. Portland News Pub. Co., 158 Or 476, 487, 77 P2d 141 (1938); Restatement (Second) of Agency §§ 268, 272 (1958).

acting adversely to the interests of the principal.® In the present case, Sevier testified that when he told Henderson of his arrest for DUIL, Henderson stated, "to Hell with it. Maybe they'll never find out." Thus, even by his own testimony, there can be no reasonable room for doubt that Sevier knew that Henderson was not going to convey the information to plaintiff. Therefore, Henderson's knowledge cannot be imputed to plaintiff.

It is also clear that plaintiff has not waived its right to rescind. The notice of cancellation or nonrenewal which was sent to Sevier soon after the discovery of his misrepresentations was necessary to prevent the automatic renewal of the policy. At the same time, the question of rescission was submitted to plaintiff's legal department for determination of its rights. These acts, taken together, indicate nothing more than the decision to sever its relations with its insured as soon as legally possible, not an intent to retain the benefits of the contract while shunning its obligations.

Nor is the payment of the property damage claim to the holder of a lien upon Sevier's automobile a basis for concluding that plaintiff waived its right to rescind the contract of liability insurance. First, this payment was clearly a detriment to plaintiff, not the retention of a benefit inconsistent with rescission. Secondly, a rider on the policy requires plaintiff to give the lienholder notice of cancellation ten days before cancellation can be effective. Thus, plaintiff was bound to satisfy the lienholder's property damage claim, notwithstanding the misrepresentations of the insured. The fact, alluded to by the majority, that no separate consideration was paid for this provision of

® Mutual Life Insurance Co. v. Hilton-Green, 241 US 613, 36 S Ct 676, 680, 60 L Ed 1202, 1211 (1916); Restatement (Second) of Agency §§ 268(1), 282 (1958).

the contract is not relevant since the lienholder was a third party beneficiary who had relied to its detriment on the promise not to rescind in loaning Sevier money secured by a lien on the automobile covered by the policy. Since plaintiff was bound to satisfy the lienholder's claim, no intent to waive its election to rescind can be based upon the payment.

Because the policy was validly rescinded as to Sevier, the fact that the innocent third party played no part in Sevier's misrepresentations and knew nothing of the collusion with Henderson, plaintiff's agent, is irrelevant. The holding of the majority is supportable, then, only if plaintiff is obligated to compensate defendant Sutton for her losses because of a duty not directly referable to the legally unenforceable contract with Sevier. The majority does not enlighten us as to the source or scope of this duty.

It is, perhaps, the majority's position that the policy that "one who selects an agent and delegates authority to him should incur the risks of the agent's infidelity or want of diligence rather than innocent third persons," should be extended to protect one in the position of defendant Sutton. The problems with such approach, if intended by the majority, are insurmountable. Defendant Sutton's damages were not caused, in any reasonable sense, by the misfeasance of plaintiff's agent. She cannot have relied upon the presence of insurance in sharing the road with Sevier, since insurance is not a pre-condition for driving in Oregon. Moreover, even if a theory of causation could be constructed, there is no finding that plaintiff was negligent in hiring or retaining the services of Henderson, nor is there any basis apparent in the record for such a finding. Nor does the majority purport to make a principal strictly liable for the breaches of fiduciary duty of an agent.

I am forced to conclude, therefore, that the ma-

jority's position is supportable only on the basis of the imposition of a newly created duty on insurers to investigate the representations of applicants for automobile liability insurance based upon some theory of strict liability, even though the majority purports to avoid consideration of this question. The trial court recognized that liability could be imposed only upon a theory of strict liability, which it embraced by adopting the reasoning in *Barrera*. I do not think that the reasoning in *Barrera* provides a sound basis for imposing strict liability upon plaintiff insurer in this case.

The basic premise of the *Barrera* decision which defendants urge us to adopt is that the duty of insurance carriers is no longer to be analyzed solely with reference to the contract of insurance and the rules of contract law, but is to rest also upon a noncontractual policy in favor of compensating the innocent victim of the insured's negligence. This expansion of the insurer's duty to provide protection to noncontracting parties is, in effect, the extension of the principle of strict liability, not unlike that which characterizes the liability of the seller of products. The California court makes this extension by pointing to various factors which, it is argued, justify the imposition of strict liability upon insurers.

First, it is said that the sale of insurance is a "quasi-public" business and that therefore the rights and obligations of the insurer and insured "cannot be determined solely on the basis of rules pertaining to private contracts negotiated by individual parties of relatively equal bargaining strength." *Barrera, supra* 456 P2d at 681-682. This seems to combine and confuse two ideas: (1) the idea that a business affected with the public interest owes duties to the public at large, and (2) the principle that adhesion contracts are to be treated differently than other contractual relations where the parties have equal bargaining posi-

tions. As to the latter consideration, we are unable to see how the adhesion character of the contract has any relevance except in defining the rights and duties of the contracting parties. And as to the contracting parties, the adhesive character of the contract is not involved in a case such as the one before us because there is no indication that an ordinary insured would read his policy as providing coverage notwithstanding misrepresentations affecting the nature of the risk. The "quasi-public" character of the insurance business may be conceded. As such, the business is subject to more extensive state regulation than most other businesses. But this tells us nothing about the scope of the regulation, specifically as to whether the insurer is required to investigate applicants for insurance. It is clear that no statute or regulation requires such investigation.[7]

The *Barrera* opinion attempts to find in the California financial responsibility law the policy to compensate the innocent victims of traffic accidents.[8] Conceding that financial responsibility statutes are designed to protect such innocent victims, the question is to what extent. Such statutes do not, in most jurisdictions, require all drivers to have insurance.[9]

---

[7] See Kimball, The Purpose of Insurance Regulation: A Preliminary Inquiry into the Theory of Insurance Law, 45 Minn L Rev 471 (1961).

[8] 456 P2d at 683.

[9] Financial responsibility laws may be regarded as representing a legislative compromise between the interest of the innocent victims of negligence (not all innocent victims) and the interest in freedom of individuals not to buy insurance. The compromise, however, is built on the foundation of pre-existing insurance law, including the right of rescission. (See, e.g., ORS 743.042, ORS 486.551; Comment, 40 Or L Rev 351, 352 (1961). The most that can be said of limited financial responsibility laws, under which insurance is required as a pre-condition for driving only of those who have demonstrated their financial irresponsibility and their accident proneness, is that the legislature has a general policy in favor of compensation of the inno-

The fundamental inadequacy of the reasoning underlying the *Barrera* decision is its failure to recognize the relationship of the parties to the typical contract of automobile liability insurance and the limited extent to which financial responsibility laws alter this relationship. In the first instance, at least, the insurance carrier agrees to accept a predictable risk of loss to the insured through the insured's liability to another. This contractual duty runs to the insured and is historically and fundamentally a duty to indemnify. The rights of a third person are derivative of those of the insured.[⑩]

It is my opinion that the *Barrera* decision

---

cent victim of negligence, which policy is not sufficiently strong to extend to requiring all drivers to be insured or to support compensation regardless of fault. (See, Recent Developments in Automobile Accident Compensation, 50 Colum L Rev 301 (1950), for discussion of the various policies underlying financial responsibility laws.) The fact that some losses will not be recompensed because of the financial irresponsibility of negligent motorists has been recognized not by abolishing the defense of insurers to fraud and misrepresentation, but instead, of requiring those who insure themselves against the consequences of their own negligence to purchase protection against the negligence of uninsured motorists as well. (ORS 743.789). Thus, it is not accurate to say that the admitted public policy of concern for the innocent accident victim has been extended so far as to require imposition of a duty upon insurers to investigate the veracity of applicants.

We express no opinion on whether the public interest might not be better served by requiring a reasonable investigation by insurers or requiring them to take notice of motor vehicle records. This is a question best left to the legislature, which is better suited to modify the complex of automobile insurance regulation which necessarily involves compromise of conflicting public policies.

⑩ Bonney v. Jones, 249 Or 578, 439 P2d 881 (1968); Allegretto v. Oregon Automobile Insurance Co., 140 Or 538, 544, 13 P2d 647 (1932) (overruled on other grounds); Bailey v. Universal Underwriters, 258 Or 201, 219, 474 P2d 746, 482 P2d 158 (1971); Mayflower Ins. Exchange v. Gilmont, 280 F2d 13 (9th Cir 1960) (construing Oregon Law). See Jarvis v. Indemnity Ins. Co., 227 Or 508, 516, 363 P2d 740 (1960).

cannot be supported by reasoned analysis of the legal principles embodied in the statutory and case law which governs the rights and duties of liability insurers in "financial responsibility" states such as Oregon and California and results in the judicial imposition of absolute or enterprise liability contrary to both our case law and Oregon's financial responsibility law. Therefore, I would hold that in the absence of contract provision or statute establishing one, there is no duty on an insurer to investigate the veracity of its insureds.

To my knowledge, none of the statutes impose upon the insurer the duty to investigate applicants. In those limited situations in which the insurer is not permitted to rescind, the defense is explicitly abolished (ORS 486.551) rather than being conditioned upon due care of the insurer. There is nothing in the framework of financial responsibility legislation which justifies the conclusion that pre-existing insurance law, including the right to rescind the contract for misrepresentation, was to be abandoned in order to compensate the victims of traffic accidents.

Defendants contend that a duty to investigate might also be predicated upon what is described as the "analogous" duty of insurers to prove that they have acted diligently and with good faith before they may invoke their insured's non-cooperation as a defense to liability under a policy of insurance. The case of *Bailey v. Universal Underwriters,* 258 Or 201, 474 P2d 746, 482 P2d 158 (1971) is relied upon to support this argument. The duty to exercise diligence and good faith to secure the cooperation of the insured extending to determine coverage under an omnibus clause is not, however, analogous to the duty imposed upon insurers in *Barrera.* Rather, it is a duty arising from the contract and running directly to the insured. We recognized in *Bailey,* that "[t]he obligations under a

cooperation clause are reciprocal," quoting *Imperiali v. Pica,* 338 Mass 494, 497, 156 NE2d 44 (1959) (258 Or at 221) and "a conflict of interest arose between the insurer, as agent, and the insured, as principal; and the insurance company's conduct in such a case is subject to closer scrutiny than that of the ordinary agent, because of its adverse interests," quoting *Tennessee Farmers Mutual Insurance Co. v. Wood,* 277 F2d 21 (6th Cir 1960) (258 Or at 224). There was no intimation in *Bailey* that the insurer's neglect of this duty would place a judgment holder of the insured in a position superior to that of the insured.[①] To the extent that *Bailey* gives the impression that there is a duty to the world at large, it must be disapproved.

I conclude, therefore, that there is in general no common law duty on insurers to investigate the representations of their insureds. Nor can I find grounds for the creation of such a duty in Oregon's financial responsibility laws.[②] ORS 486.551 states:

"The liability of an insurance carrier with respect to the insurance policy required by this chapter to prove future responsibility shall become absolute whenever injury or damage covered by the vehicle liability policy occurs. The policy may not be canceled or annulled as to such liability by any agreement between the insurance carrier and the in-

---

[①] Defendants' reliance upon *Bailey* may be based upon a misreading of its somewhat ambiguous holding: "We hold that the defendant insurance company owed a duty to make a diligent investigation of the accident involved in this case, and one in good faith, including the question whether the vehicle involved was covered by the policy issued by defendant." (258 Or at 226). In fact, we did not require that the insurer investigate the physical facts of the accident but held that it had satisfied its duty simply by making reasonable inquiry of its insured and of the tortfeasor of whether the latter came within the omnibus clause of the insured's policy. This duty arose out of the contract and does not depend upon the court's willingness to give pre-eminence to one of the many public policies involved in regulation of automobile insurance.

[②] ORS ch 486.

sured after the occurrence of the injury or damage. No statement made by the insured or on his behalf and in violation of the policy shall defeat or void the policy. *The provisions of this section are not applicable to policies of vehicle liability insurance other than those required in connection with proof of future responsibility."* (Emphasis added.)[19]

Thus, to follow the *Barrera* decision would be to modify the structure of insurance regulation and the relationship of the parties beyond that intended by the legislature. Therefore, I would hold that plaintiff was entitled to rescind the policy and is not liable to either defendant.

DENECKE and HOLMAN, JJ. join in this dissent.

DENECKE, J., dissenting.

I join in the dissent of the Chief Justice. I write only to summarize what I believe is the basic controversy and some of the reasons supporting the dissent.

Both the majority and the dissent assume for the purposes of their legal differences that Sevier and Henderson colluded. I probably would not so find on a de novo hearing but I will make that same assumption in order to take a position in the principal controversy.

I join the dissent because of what I believe are the logical implications of the majority opinion which I am unwilling to accept.

The majority holds that an injured third party can recover against the liability insurer although the insurer has no duty to the insured under its insurance contract. Previously we have always held to the contrary. For examples, *Allegretto v. Ore. Auto Ins. Co.,* 140 Or 538, 544, 13 P2d 647 (1932); *Bonney v. Jones,* 249 Or 578, 580, 439 P2d 881 (1968).

---

[19] See, Comment, 40 Or L Rev 351 (1961).

The majority is of the opinion that the principal reason why an injured third party should be permitted to recover is because of a strong state public policy to protect victims of vehicle accidents.

In *State Farm Ins. v. Farmers Ins. Exch.*, 238 Or 285, 387 P2d 825, 393 P2d 768 (1964) and *Bailey v. Universal Underwriters Ins.*, 258 Or 201, 474 P2d 746,. 482 P2d 158 (1971) we expressed this policy. In those cases however, we did not hold the injured third party could recover on an insurance policy although the insurer owed no duty of indemnity to its insured.

This same public policy just as logically can be invoked to hold that an injured third party can recover although the insurer owes no duty of indemnity to the insured because the insured has failed to perform any of the expressed or implied duties the insured has in a liability insurance contract. Included in these are such duties as giving notice of an accident, cooperating in the defense, etc.

The legislatures of Oregon and other states have enacted legislation depriving insurers of certain policy defenses when insurers issue policies as proof of financial responsibility. The legislatures expressly exempted other insurance policies from this legislation. ORS 486.551; 40 Or L. Rev. 351 (1961). The rationale behind such legislation probably is that financially irresponsible drivers who have to furnish proof of financial responsibility after an accident, as a class, probably are apt to fail to perform obligations assumed by them in their insurance contract. Apparently the legislatures believed that other classes of drivers were not apt to be so irresponsible. I have no knowledge that the legislative belief was not well founded and the distinction between these classes continues to exist.

Another facet in the present case evidences that

it is not vital for the protection of traffic victims that we judicially change the contract law of Oregon. All contracts of liability insurance are required to provide uninsured motorist coverage in order to protect parties injured by tortfeasors having no insurance. ORS 743.-786 and following. The defendant Mutual of Enumclaw Insurance Company provided such coverage to the Suttons. A portion of this litigation is not to recover damages for a traffic victim but to determine if State Farm or Mutual of Enumclaw is to bear the loss.